FILED

07/28/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0500

DA 23-0500

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 169

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

WILLIE TODD VELTKAMP,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDC-20-241
Honorable John A. Kutzman, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           Tammy A. Hinderman, Appellate Defender Division Administrator, Kathryn Grear Hutchison, Assistant Appellate Defender, Helena, Montana

       For Appellee:

           Austin Knudsen, Montana Attorney General, Selene Koepke, Assistant Attorney General, Helena, Montana

           Josh Racki, Cascade County Attorney, Ashlee Kummer, Deputy County Attorney, Great Falls, Montana

Submitted on Briefs: April 29, 2026

Decided:  July 28, 2026

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1	Willie Veltkamp (Veltkamp) appeals his conviction for two counts of felony incest in violation of § 45-5-507, MCA, following a jury trial in the Eighth Judicial District Court, Cascade County.  We affirm.

¶2	We restate the issues on appeal as follows:[1]

*Issue One: Whether the admission of J.V.'s statements in the SANE Report was reversible error.*

*Issue Two: Whether allowing the jury to view the SANE Report during deliberations was reversible error.*

*Issue Three: Whether the admission of text messages between J.V. and her mother was reversible error.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3	Veltkamp and his wife, Glenda, lived in Great Falls, Montana, with their daughters, J.V. and C.V.  On the night of April 15, 2020, 14-year-old J.V. was in her bedroom. Veltkamp entered and began touching her.  He told J.V., who was menstruating, to go to the bathroom and remove her tampon.  When she returned, Veltkamp held her down and penetrated her vagina with his penis.  He eventually ejaculated and left the room.

¶4	Around 12:00 p.m. on April 16, 2020, Glenda received a series of text messages from J.V. which read:

---

[1] Veltkamp, in one of his issue statements, suggests that "collectively, these errors prejudiced Willie's right to a fair trial," which presumably is a reference to the cumulative error doctrine. However, Veltkamp provides no discussion or authority for applying cumulative error except to address that each alleged error is not harmless.  Because we find each of the alleged errors were harmless, we will not develop a cumulative error argument on Veltkamp's behalf. "It is not this Court's obligation to develop parties' arguments for them." *City of Billings v. Peterson*, 2004 MT 232, ¶ 45, 322 Mont. 444, 97 P.3d 532 (citation omitted).

Okay, so……. there is this thing I need [to tell you] but I'm scared to say because it will ruin my life and mess up other people's to [sic] but I cant [sic] let this keep happening to me… [I don't know] how to say it, because I dont [sic] want everything to change, and [please don't] come down and talk to me about it cuz [sic] it's hard as it is. . . . O[k]ay, so I'll just put it that I'm technically not a virgin cuz [sic] of dad. . . .

Glenda immediately went to speak with J.V., who told her that Veltkamp had sex with her the previous night. J.V. would allege the conduct had occurred several times a month since she was nine or ten years old. Glenda had never suspected this and, according to J.V., the abuse generally occurred when she was out of the house. On Glenda's instruction, J.V. gathered and bagged her clothes from the previous night. Glenda also gathered the fitted sheet from J.V.'s bed. Glenda drove J.V. to the hospital.

¶5 Veltkamp returned to the house as Glenda pulled out of the driveway with both J.V. and C.V. in the car. Whether Veltkamp noticed his family departing is unknown, but he called the Great Falls police to report his family was missing at around 1:30 p.m. Great Falls Police Department Detective Cara Guderian (Detective Guderian) answered Veltkamp's call. Almost contemporaneously, Detective Guderian also learned that Glenda and J.V. were obtaining a sexual assault examination. Detective Guderian told Veltkamp that his wife and daughters were safe but refused to disclose their location. Detective Guderian then went to the hospital to meet J.V. and Glenda.

¶6 At the hospital, Nurse Steven Brant (Nurse Brant), a Sexual Assault Nurse Examiner (SANE), examined J.V. with Detective Guderian present. As a part of the examination, Nurse Brant obtained a statement from J.V. describing the rape:

Probably about 2100, we were getting ready for bed. My dad, Willie Veltkamp, tucked my sister [C.V.] in first. He came down to tuck me in and

3

was lying on the bed with me. He told me to go to the bathroom and take my tampon out. Then he pulled my pants down and he put his penis inside of me. He did that for a while. He pulled out and came in his hand and left. He acted like nothing ever happened and then I went to bed.

J.V. also disclosed that Veltkamp penetrated her vagina with his fingers and tongue. Nurse Brant compiled a written report (SANE Report) which included all of J.V.'s statements regarding the incident as well as Nurse Brant's observations of lacerations and abrasions present on and around J.V.'s vagina. The SANE Report noted J.V. had showered that morning. The SANE Report, J.V.'s clothing, J.V.'s current tampon, and J.V.'s bedding were sent to the Montana State Crime Lab for analysis.

¶7     Following the conclusion of the sexual assault exam, Detective Guderian returned to the Great Falls police station to interview Veltkamp. Law enforcement obtained a search warrant to conduct an exam on Veltkamp: a nurse gathered penile scrotal and buccal swab samples from him. These swabs were also sent to the Montana State Crime Lab for testing.

¶8     Veltkamp's penile scrotal swab tested positive for J.V.'s blood and J.V.'s bed sheet tested positive for Veltkamp's semen. J.V.'s clothing and a cervical swab conducted in the SANE exam tested negative for Veltkamp's DNA.

¶9     On April 23, 2020, the State filed an Information charging Veltkamp with one count of incest. On June 5, 2020, the State filed an Amended Information charging Veltkamp with three counts of incest. Count I referred to the incident of April 15, 2020; Count II referred to the continuous course of conduct J.V. alleged had occurred between January 1, 2016, and April 1, 2020; and Count III referred to an incident alleged to have occurred on April 10, 2020. The matter proceeded to trial in early February 2023.

4

¶10 Nurse Brant testified about the SANE exam he conducted on J.V. Through Nurse Brant, the State moved to admit J.V.'s narrative statement in the SANE Report. Veltkamp raised a hearsay objection. The State asserted the narrative statement constituted a medical record "taken for purposes of diagnosis." Veltkamp maintained that narrative statements in the context of a sexual assault examination were not diagnostic but rather were testimonial in nature because they were obtained to gather evidence "to be used in a future court proceeding." The District Court agreed with the State and overruled the objection. Nurse Brant read J.V.'s narrative statement concerning the incident of April 15, 2020, to the jury. Nurse Brant additionally described J.V.'s statements during the examination, including her recollection that Veltkamp had also penetrated her vulva digitally and orally before ejaculating into his hand. J.V. had not described any previous assaults by Veltkamp during the examination and Nurse Brant's report did not include any details about those other instances.

¶11 J.V. testified that, beginning when she was eight or nine years old, Veltkamp would rub his penis between her legs near her vagina "about once a month[.]" This behavior increased in frequency as J.V. got older until Veltkamp eventually began penetrating J.V.'s vagina with his penis when she was about 11 or 12. Regarding the April 15 incident, J.V. testified Veltkamp touched her vagina before instructing her to remove her tampon. After she removed it, he penetrated her with his penis. J.V. estimated that Veltkamp assaulted her for approximately 30 minutes and she was not sure whether he had ejaculated, but that "probably" he did. Over Veltkamp's objection, the State provided J.V. with Nurse Brant's SANE Report, already admitted into evidence, to refresh her recollection that Veltkamp

had penetrated her orally and ejaculated in his hand. With her recollection refreshed, J.V. affirmed that she made the statements in the SANE Report.

¶12 After J.V. testified about the April 15 incident, the State asked J.V. how she had disclosed Veltkamp's abuse to her mother. The prosecutor handed J.V. a copy of her April 16, 2020 text messages to Glenda. Veltkamp raised a hearsay objection. The State argued the text messages were admissible because they established the beginning of J.V.'s disclosure and were a relevant part of the investigation. The court reasoned the text messages were "central to the event that we're here to litigate" and concluded the text messages were admissible under the *res gestae* rule. J.V. then read the April 16 text messages into the record.

¶13 On cross-examination, J.V. acknowledged only disclosing the April 15 incident to Nurse Brant and not the previous incidents. J.V. explained on redirect that on April 16, 2020, at the time of her SANE exam, she was not ready to come forward with the other incidents of abuse perpetrated by Veltkamp. J.V. did testify that the most recent abuse prior to April 15 took place approximately five days earlier, or around April 10, 2020.

¶14 Following J.V.'s testimony, the State called Detective Guderian to testify. Detective Guderian recounted J.V.'s statements during the sexual assault examination:

> [J.V.] disclosed that the night prior, it would have been April 15th, her dad had come downstairs to snuggle her. And during that time, he had pulled down her pants, pushed her onto the bed and pinned her arms onto the bed and proceeded to put his penis inside her vagina and then also he digitally penetrated her and then licked her vagina as well.

The State next asked whether J.V. had said "anything else about what had happened at the end[,]" alluding to J.V.'s SANE Report statements that Detective Guderian had witnessed.

6

Veltkamp objected on hearsay grounds. The State responded that the narrative statement was admissible for impeachment of J.V. because J.V. failed to testify that Veltkamp penetrated her orally and that Veltkamp had ejaculated into his hand. The District Court overruled the objection and allowed Detective Guderian to answer.

¶15 Glenda also testified and read to the jury the text messages she had received from J.V., which had already been admitted into the record following an objection by Veltkamp. The exhibit was published to the jury.

¶16 During the discussion between the District Court and the parties regarding what evidence the jury could review during deliberations, Veltkamp reiterated his objection to providing the jury with Nurse Brant's SANE Report on hearsay grounds. The District Court concluded the jury could review the SANE Report.

¶17 The jury convicted Veltkamp on Count I, for incest on April 15, 2020, and Count II, for incest occurring between January 1, 2016, and April 1, 2020. The jury acquitted Veltkamp on Count III, regarding the alleged incident on April 10, 2020. On May 25, 2023, the court sentenced Veltkamp to the Montana State Prison for two consecutive 100-year sentences, with no time suspended. Veltkamp now appeals.

**STANDARD OF REVIEW**

¶18 This Court generally reviews a district court's evidentiary rulings for an abuse of discretion. *State v. Sage*, 2010 MT 156, ¶ 21, 357 Mont. 99, 235 P.3d 1284; *State v. Stewart*, 2012 MT 317, ¶ 23, 367 Mont. 503, 291 P.3d 1187. However, a district court is bound by the Montana Rules of Evidence as well as applicable statutes, and to the extent

7

the district court's ruling is based on an interpretation of an evidentiary rule or statute, we review the ruling de novo.  *Sage*, ¶ 21; *Stewart*, ¶ 23.

¶19    We review a district court's decision on the evidence that may be taken into the jury room during deliberations for an abuse of discretion.  *State v. Nordholm*, 2019 MT 165, ¶ 8, 396 Mont. 384, 445 P.3d 799; *State v. Bales*, 1999 MT 334, ¶ 24, 297 Mont. 402, 994 P.2d 17.  A district court abuses its discretion if it acts arbitrarily, unreasonably, or without employing conscientious judgment, resulting in substantial injustice.  *Nordholm*, ¶ 8.

## DISCUSSION

¶20    *Issue One: Whether the admission of J.V.'s statements in the SANE Report was reversible error.*

¶21    "Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."  M. R. Evid. 801(c).  Hearsay is inadmissible except as provided by statute, the Rules of Evidence, or other applicable rules.  M. R. Evid. 802.

¶22    The State argued at trial that the narrative statements J.V. made in the SANE Report were admissible as statements made for purposes of medical diagnosis or treatment and therefore an exception to the rule against hearsay.  M. R. Evid. 803(4).  The District Court admitted them pursuant to this exception.  On appeal, the State concedes this was error and further maintains that Veltkamp's reliance on *State v. Martinez*, 2023 MT 251, ¶¶ 26-27, 414 Mont. 340, 545 P.3d 652 and *State v. Tome*, 2021 MT 229, ¶ 27, 405 Mont. 292, 495 P.3d 54, is misplaced because those cases involve the right of confrontation and Veltkamp's accuser, J.V. testified and was subject to cross-examination.

¶23 A SANE report serves to compile evidence as part of an investigation in anticipation of future litigation and thus does not constitute a statement made for the purpose of diagnosis. *Martinez*, ¶¶ 26-27; *Tome*, ¶ 27. In *Martinez*, the victim made statements to the forensic nurse during a SANE examination, and was referred to a physician for follow-up care, to whom she again disclosed Martinez's abuse. *Martinez*, ¶¶ 6, 10. We explained that the victim's statements to the SANE nurse and the physician must be evaluated independently to determine whether they are testimonial. *Martinez*, ¶ 22. We explained that the victim's statements to the physician were nontestimonial because they were made for the primary purpose of obtaining medical care. *Martinez*, ¶ 23. We further explained that the victim's statements to the physician, while hearsay, were admissible under M. R. Evid. 803(4), because the statements were made "for the purposes of medical diagnosis" insofar as reasonably pertinent to diagnosis or treatment. *Martinez*, ¶ 23. Regarding the statements to the SANE nurse, we held, relying on *Tome*, that the statements were testimonial in nature and inadmissible "absent Martinez having an opportunity for cross-examination." *Martinez*, ¶ 27. Because the victim in *Martinez* did not testify and was not available for cross-examination, we held that the admission of the victim's statements through the SANE nurse violated Martinez's right to confrontation. *Martinez*, ¶ 27; *see also State v. Harris*, 247 Mont. 405, 412, 808 P.2d 453, 457 (1991) (declining to extend the Rule 803(4) exception beyond doctors in cases involving abuse of young children).

¶24 In *Tome*, the victim was developmentally disabled and determined by the court to be incompetent to testify. *Tome*, ¶ 13. We held that because her statements made to a

SANE nurse were testimonial and she was not available to testify, their admission violated Tome's right of confrontation. *Tome*, ¶ 35. Noting that while Tome had the opportunity to cross-examine those who read or reiterated the victim's statements, we reversed Tome's conviction because the statements, which were provided to the jury through a video were "a powerful presentation of the State's complaining witness—a witness who was out-of-reach and unavailable for cross-examination." *Tome*, ¶¶ 35, 37.

¶25 The confrontation clause is not implicated here as it was in *Martinez* and *Tome* because J.V. was present at trial, testified, and was cross-examined by Veltkamp. The error that occurred was under the hearsay rule—admitting the hearsay statements contained in the SANE Report when the statements were clearly not provided for the purpose of medical diagnosis or treatment. Thus, the SANE Report was erroneously admitted under the medical diagnosis exception to the rule against hearsay. M. R. Evid. 803(4). Veltkamp has established, and the State has conceded, this was error. We turn now to whether the other admissible evidence proved the same facts as the tainted evidence. *State v. Van Kirk*, 2001 MT 184, ¶ 43, 306 Mont. 215, 32 P.3d 735.

¶26 "A cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows the error was prejudicial." Section 46-20-701(1), MCA. This Court utilizes a two-step analysis to determine whether an error prejudiced a criminal defendant's right to a fair trial and therefore merits reversal. *Van Kirk*, ¶ 37. First, we determine whether the error presents a structural error or a trial error. *Van Kirk*, ¶ 41. If a structural error exists, our inquiry ends and the verdict is reversed. *Van Kirk*, ¶ 41. Instead, if the error presents "the more typical 'trial' error," we

10

proceed to the second step of our analysis to determine whether "the error was harmless under the circumstances." *Van Kirk*, ¶ 41.

¶27 Trial error refers to "that type of error that typically occurs during the presentation of a case to the jury" and is "amenable to qualitative assessment by a reviewing court for prejudicial impact relative to the other evidence introduced at trial." *Van Kirk*, ¶ 40. Moreover, "[t]rial error is not presumptively prejudicial and therefore not automatically reversible[.]" *Van Kirk*, ¶ 40 (citing § 46-20-701(1), MCA). "As a threshold matter, once a convicted person raises and establishes that the evidence in question was erroneously admitted and has alleged prejudice under the 'reasonable possibility' test, it then becomes incumbent on the State to demonstrate that the error at issue was not prejudicial." *Van Kirk*, ¶ 42. This question turns on whether the factfinder "was presented with admissible evidence that proved *the same facts as the tainted evidence proved*." *Van Kirk*, ¶ 43 (emphasis in original).

¶28 Here, the cumulative evidence properly admitted at trial negated any prejudice incurred by Veltkamp by the erroneously admitted SANE Report. This cumulative evidence includes J.V.'s narrative statement in the SANE Report which was properly admitted as a prior inconsistent statement through testimony of Detective Guderian. Detective Guderian witnessed the exam: she was present and able to corroborate J.V.'s narrative statement in the SANE Report, which differed from her testimony at trial where she did not testify to some of Veltkamp's specific actions, including oral penetration and Veltkamp ejaculating into his hand. A statement is not hearsay if the declarant testifies at trial, is subject to cross-examination, and the statement is inconsistent with the declarant's

11

testimony. M. R. Evid. 801(d)(1). A prior inconsistent statement is admitted as substantive evidence in Montana, for the truth of the matter asserted therein. *State v. White Water*, 194 Mont. 85, 88-89, 634 P.2d 630, 638 (1981). Thus, the SANE Report, properly admitted as J.V.'s prior inconsistent statement through Detective Guderian to prove the same facts as the erroneously admitted evidence, negated any prejudice to Veltkamp from the erroneous admission of the same through Nurse Brant.

¶29 Under our harmless error test, the proper admission of this evidence as a prior inconsistent statement proved the same facts the tainted evidence proved. *Van Kirk*, ¶ 43. Thus, Veltkamp was not prejudiced by the erroneous introduction of the SANE Report through Nurse Brant's testimony. Accordingly, the erroneous initial introduction of the SANE Report, in the context of the specific facts of the instant case, did not constitute reversible error because cumulative evidence of the same facts was also admitted at trial.

¶30 *Issue Two: Whether allowing the jury to view the SANE Report during deliberations was reversible error.*

¶31 "Generally, jurors may take into the jury room 'all exhibits that have been [admitted] as evidence in the [case] that in the opinion of the court will be necessary' to their deliberations." *State v. Walks*, 2025 MT 147, ¶ 12, 423 Mont. 35, 571 P.3d 648 (citing § 46-16-504, MCA). Despite the statute not distinguishing between demonstrative and testimonial exhibits, we have held that "nothing in the plain language of § 46-16-504, MCA, suggests that the legislature intended this statute to abrogate the common law rule against the submission of testimonial materials" to the jury during deliberations. *Bales*, ¶¶ 18, 24.

¶32 "When assessing whether the jury may access certain evidence, the threshold question is whether the evidence is either testimony or testimonial in nature[.]" *Walks*, ¶ 13. "Testimonial evidence" refers to "a person's testimony offered to prove the truth of the matter asserted[,]" especially evidence elicited from a witness. *State v. Stout*, 2010 MT 137, ¶ 30, 356 Mont. 468, 237 P.3d 37 (citing *Testimonial Evidence*, *Black's Law Dictionary* (9th ed. 2009)).

¶33 Here, the SANE Report submitted to the jury in the instant case was testimonial evidence. *See Martinez*, ¶¶ 26-27 (citing *Tome*, ¶ 15) (a SANE examination is testimonial when conducted to collect evidence of sex-based crimes for purposes of future litigation). Submitting testimonial evidence to the jury for review during deliberations is an abuse of discretion by the district court. *Bales*, ¶ 24. "A violation of the rule prohibiting a jury's unsupervised and unrestricted access to testimonial evidence during deliberations is trial error rather than structural error." *Walks*, ¶ 23 (citing *State v. Hoover*, 2021 MT 276, ¶ 23, 406 Mont. 132, 497 P.3d 598; *Nordholm*, ¶ 12; *State v. Hart*, 2009 MT 268, ¶ 35, 352 Mont. 92, 214 P.3d 1273). Thus, it is incumbent upon the State to prove the error was harmless by demonstrating "that there is no reasonable possibility that the unsupervised review of the [testimonial evidence] by the jury during its deliberations might have contributed to [the] conviction." *Walks*, ¶ 23 (citing *Nordholm*, ¶ 12; *Van Kirk*, ¶ 47). The State may satisfy this burden by "pointing to other admitted evidence that proved the same facts as the tainted evidence and showing by qualitative comparison that it could not reasonably have contributed to the conviction." *Walks*, ¶ 23 (citing *Hoover*, ¶ 23; *Van Kirk*, ¶ 47).

13

¶34    We have held that unsupervised and unrestricted access to testimonial evidence by a jury during deliberations constituted reversible error. *Nordholm*, ¶ 14. There, the court provided the jury with unrestricted access to four recordings of statements made to police by witnesses and the defendant. *Nordholm*, ¶ 14. The recordings at issue captured out-of-court conversations between police officers, the defendant, the victim, and multiple witnesses concerning the events leading up to the defendant's arrest. *Nordholm*, ¶¶ 4-6. Regardless of whether the "other evidence presented at trial proved at least some of the same facts as those in the videos[,]" the State could not prove "that there [was] no reasonable possibility that the jury's review of these testimonial videos contributed" to the conviction because the "qualitative effect of the jury's review of the videos is both unknown and unknowable because they were given unsupervised access to view the videos as many times as they wished." *Nordholm*, ¶¶ 13-14 (citing *Van Kirk*, ¶ 47). Because the jury could review the recordings "repeatedly[,]" we found the jury could "therefore give [. . .] undue emphasis" to the videos rather than "rely on its collective memory to assess the testimony of those witnesses[.]" *Nordholm*, ¶ 14 (citation omitted). Our conclusion in *Nordholm* turned on the ability of the jury to "repeatedly view the statements" made by the defendant and others in the recordings. *Nordholm*, ¶ 13. The risk, therefore, of undue emphasis on these videos, to the detriment of the jury's collective memory of "testimony given at trial, including statements made during cross examination," created "a fundamental imbalance" meriting remand for a new trial. *Nordholm*, ¶¶ 13-14.

¶35    On the other hand, we have concluded that the erroneous submission of testimonial materials to the jury during deliberations, when viewed in the context of the evidence

14

presented at trial, did not prejudice the defendant's right to a fair trial. *Walks*, ¶ 28. In *Walks*, the eight-year-old victim, K.P., "hesitated to discuss in court" what had occurred with the defendant. *Walks*, ¶ 3. To accommodate her reluctance to testify at trial, the State presented K.P. with an anatomical drawing and she circled where Walks had touched her. *Walks*, ¶ 3. This image, with K.P.'s identifying circle, was admitted into evidence. *Walks*, ¶ 3. In response to a question regarding "what touched the circled body part," K.P. offered to "draw it" and then drew a hand. *Walks*, ¶ 3. This was also admitted into evidence. *Walks*, ¶ 3. She identified the hand as Walks's. *Walks*, ¶ 3. The district court allowed the jury to view the two drawings during deliberations. *Walks*, ¶ 9. On appeal, this Court affirmed, finding the error was harmless regardless of the testimonial nature of the drawings because "the State also presented other compelling cumulative evidence proving the same facts as the [t]rial [d]rawings and, by qualitative comparison, there [was] no reasonable possibility that the limited communicative content" contained therein contributed to the conviction. *Walks*, ¶ 26. We distinguished the *Nordholm* body camera footage from the trial drawings because the drawings did not identify Walks as the perpetrator, communicate the victim's allegations as to what happened and where, and did not include any identifying features. *Walks*, ¶ 27 (citing *Nordholm*, ¶¶ 4-6, 13-14).

¶36 Here, the abuse of discretion by the District Court in submitting the SANE Report to the jury during deliberations was ultimately harmless because the testimonial content of the SANE Report was sufficiently cumulative to other evidence presented at trial to not unduly emphasize the SANE Report. *Bales*, ¶ 30. The SANE Report is more analogous to the trial drawings in *Walks* than the body camera footage in *Nordholm*. Both the SANE

Report and J.V.'s trial testimony identified Veltkamp as the perpetrator and that he vaginally penetrated her with his penis. Although the SANE Report identified Veltkamp as the perpetrator, J.V.'s testimony and the forensic evidence demonstrating J.V.'s blood on Veltkamp's penis and Veltkamp's semen on the bed sheets provided cumulative evidence of the identity of her assailant. Moreover, J.V. was subject to cross-examination and Veltkamp took the opportunity to ask her whether her statements in the SANE Report were accurate. We conclude the submission of the SANE Report to the jury during deliberations and the additional details contained therein—J.V.'s April 16 recollections to Nurse Brant that Veltkamp orally penetrated her and later ejaculated into his hand—was harmless. The SANE Report was cumulative of the testimony and evidence presented at trial.

¶37 *Issue Three: Whether the admission of text messages between J.V. and her mother was reversible error.*

¶38 Veltkamp also challenges the admission of J.V.'s April 16 text messages to Glenda. He notes the District Court's reasoning that the text messages were part of the same transaction was pursuant to the principle of *res gestae*, which "generally refers to spontaneous declarations that are so closely connected to an occurrence that they are considered part of the occurrence." *State v. Hansen*, 1999 MT 253, ¶ 73, 296 Mont. 282, 989 P.2d 338. Under this rule, "'a remark made spontaneously and concurrently with an affray, collision or the like'" carries an inherent "'degree of credibility and will be admissible because of its spontaneous nature.'" *Hansen*, ¶ 73 (quoting *Res Gestae*, *Black's Law Dictionary* (6th ed. 1990)).

16

¶39    This Court and contemporary rules of evidence have progressed past *res gestae* and we instead utilize modern exceptions to the hearsay rule provided for in M. R. Evid. 803. *Hansen*, ¶ 81 ("The phrase *res gestae*, in itself, adds nothing but confusion to an already complex area of the law. The better practice is to abandon the use of the phrase altogether and to, instead, use the specific rule of evidence or statute that applies to the particular factual situation presented."); *see also State v. Lake*, 2022 MT 28, ¶ 45, 503 P.3d 274, 407 Mont. 350 (quoting *State v. Guill*, 2010 MT 69, ¶¶ 26-27, 355 Mont. 490, 229 P.3d 1152) ("While we have discarded the common law concept[] of *res gestae* . . . 'which, like magic incantations, ha[s] been invoked . . . [to] admit evidence of questionable value without subjecting it to critical analysis,' we have continued to recognize the validity of the statutory transaction rule where applicable by its terms, and relevant in the context of a particular case."). The modern transaction rule and associated rules of evidence permit admission of evidence that is "inextricably linked or intertwined with the defendant's criminal conduct" and that is "relevant to provide a comprehensive and complete picture of the defendant's criminal conduct." *State v. Sandberg*, 2026 MT 45, ¶ 56, 426 Mont. 416, 585 P.3d 422 (citations omitted).

¶40    Here, despite grounding the admission of the text messages in *res gestae*, the District Court properly admitted the text messages as the beginning of J.V.'s story—a story that included how J.V. began to cope with years of abuse and the difficult process of notifying someone about the abuse. The admission of the text messages was thus relevant both to Veltkamp's guilt and to J.V.'s credibility. Accordingly, the text messages were inextricably linked and relevant under the Rules of Evidence.

17

¶41 Moreover, "a defendant is not prejudiced by hearsay testimony when the statements that form the subject of the inadmissible hearsay are admitted through the direct testimony of 'out-of-court' declarant or by some other direct evidence." *State v. Veis*, 1998 MT 162, ¶ 26, 289 Mont. 450, 962 P.2d 1153 (citing *State v. Stuit*, 277 Mont. 227, 232, 921 P.2d 866, 869 (1996); *State v. Riley*, 270 Mont. 436, 440, 893 P.2d 310, 313 (1995); *State v. Graves*, 272 Mont. 451, 460, 901 P.2d 549, 555 (1995), *overruled on other grounds by State v. Herman*, 2008 MT 187, ¶ 12 n.1, 343 Mont. 494, 188 P.3d 978). In situations where "a defendant has the opportunity to cross-examine a declarant because he or she is present at trial and testifies, the dangers that the hearsay rule seeks to avoid are not present and, therefore, hearsay regarding the declarant's out-of-court statement that is admitted during another witnesses testimony is harmless." *Veis*, ¶ 26 (citing *State v. Canon,* 212 Mont. 157, 164, 687 P.2d 705, 709 (1984), *overruled on other grounds by State v. Allen*, 2010 MT 214, ¶¶ 43-44, 46, 357 Mont. 495, 241 P.3d 1045).

¶42 Here, J.V. and Glenda both testified; and Veltkamp cross-examined his wife and daughter. Both testified to the content and method of J.V.'s initial disclosure on April 16. J.V.'s April 16 text messages and her trial testimony identified Veltkamp as her assailant. The text messages were thus cumulative of J.V.'s trial testimony. Accordingly, based on our review of the record, the admission of the April 16 text messages was harmless.

**CONCLUSION**

¶43 The District Court erred as a matter of law in admitting J.V.'s statements contained within the SANE Report as statements made for the purpose of obtaining a medical diagnosis. The introduction of cumulative evidence proving those same facts rendered this

error harmless. The District Court abused its discretion by submitting the SANE Report to the jury during deliberations. This error, too, was harmless because other cumulative evidence presented at trial negated any possible prejudice that the jury may have placed undue emphasis on the SANE Report. Finally, the court properly admitted the April 16 text messages.

¶44    Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE